Hon. Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

R.H., by and through his parents and
guardians, P.H. and N.B.-H., individually, on
behalf of WASHINGTON ALLIANCE FOR
HEALTHCARE INSURANCE TRUST
HEALTH BENEFIT PLAN, and on behalf of
similarly situated individuals and plans,

          Plaintiff,

    v.

PREMERA BLUE CROSS, LIFEWISE
HEALTH PLAN OF WASHINGTON

          Defendants.

NO. 2:13-cv-00097-RAJ

MOTION FOR ATTORNEYS FEES,
EXPENSES AND INCENTIVE
AWARDS

**Noted for Hearing:
January 9, 2015**

## I.   INTRODUCTION

In a landmark settlement, class counsel obtained broad prospective relief for thousands of Premera insureds – valued at no less than $3 million in covered claims per year – in addition to a cash fund for back neurodevelopmental therapy benefit claims totaling $3.5 million.  As a result of class counsels' years of effort, children with developmental disabilities who have Premera coverage will be able to access medically necessary Neurodevelopmental Therapy (NDT) and Applied Behavior Analysis (ABA)

Sirianni Youtz
Spoonemore Hamburger
999 Third Avenue, Suite 3650
Seattle, Washington  98104
Tel. (206) 223-0303   Fax (206) 223-0246

therapies to treat their conditions.  For many children, access to these therapies is life-changing – even to the point of preventing lifelong disability.  *The Seattle Times* recognized this, and went out of its way to applaud the efforts of class counsel as the only meaningful enforcement of Washington's Mental Health Parity Act:

> …Washington remains in a minority of states without an insurance mandate to cover these therapies.  The Legislature has failed to act, and so has the state insurance commissioner.
>
> But a series of lawsuits since 2010 has begun to change all that.  One insurer after another – including Group Health, Medicaid, the state employees' plan and, just this week, Premera – have settled suits and begun coverage.
>
> …
>
> [Insurance Commissioner Mike] Kreidler and the Legislature left enforcement to class-action lawyers, in particular attorneys Rick Spoonemore and Ele Hamburger.
>
> These attorneys' settlement with Premera this week is a significant victory for families raising children with autism.  True mental health parity has a long way to go but it is now a journey a little less far.

Hamburger Decl., *Exh. A*, "State Needs Mandate to Cover Autism Therapy," *The Seattle Times*, May 21, 2014.

Class counsel now seeks a fee award of $1,225,000, or 35% of just the cash fund. This amount represents less than 18% of the ***total*** benefit to class members, which includes not only the back benefits cash but also the value of prospective relief securing coverage of medically necessary NDT and ABA services for all Premera insureds.  *See Vizcaino v. Microsoft Corp.,* 142 F. Supp. 2d 1299, 1305 (W.D. Wash. 2001) ("[T]he 'benchmark' percentage of recovery fee is 25% of the recovery obtained, ***including future benefits***.") (emphasis added).

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 2
[Case No. 2:13-cv-00097-RAJ]

Class counsel also seek reimbursement of $66,681.72 in costs incurred to date in all three cases[1] and incentive awards of $25,000 for each named plaintiff family in each case (totaling $100,000) to account for their time, effort and risk in prosecuting these cases.

## II.  BACKGROUND

For years Premera ignored the requirements of Washington's Mental Parity Act, RCW 48.43.341, ("Parity Act") when it came to covering services for insureds with developmental disabilities.  Although the Parity Act required coverage of all medically necessary services to treat conditions listed in the Diagnostic and Statistical Manual (DSM), Premera applied the Parity Act only to psychiatric conditions.  Developmental DSM conditions such as autism, expressive language disorder and mental retardation continued to be excluded from full coverage.  For example, Premera completely excluded coverage of NDT (speech, occupational and physical therapies to treat developmental conditions) from its individual plans, and excluded all such coverage for insureds over the age of six from its group plans.  Moreover, Premera continued to apply a "developmental disabilities" exclusion, allowing the insurer to eliminate all coverage for any condition considered "developmental" in nature, such as autism or any service deemed to treat only developmental disabilities.  Premera routinely informed its insureds who asked that ABA therapy to treat autism was not covered. Hamburger Decl. ¶2.

On April 17, 2012, King County Superior Court Judge Michael J. Trickey ruled that Premera's "developmental disability" exclusion violated both the Parity Act and Washington public policy:

---

[1] Class counsel will submit a supplemental brief prior to the Final Approval Hearing on January 9, 2014, identifying any additional litigation expenses to be included in this amount.

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 3
[Case No. 2:13-cv-00097-RAJ]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

> Given the broad mandate regarding mental health services in the Mental Health Parity Act, RCW 48.44.341, and pursuant to Washington's Declaratory Judgment Act, RCW 7.24, *et seq.*, Plaintiff A.G. is entitled to a declaration that the exclusion in Defendants' policies for "[s]ervices, therapy and supplies related to the treatment of … developmental delay or neurodevelopmental disabilities" violates Washington public policy and the Mental Health Parity Act. The Court declares the exclusion void and unenforceable in this case.

> Under the Mental Health Parity Act, Defendants must provide coverage for all medically necessary "mental health services" to the same extent as they provide coverage for other medical and surgical services. Neurodevelopmental therapies are "mental health services" designed to treat autism, a mental disorder listed in the DSM-IV. Since neurodevelopmental therapies may be medically necessary to treat autism, Defendants cannot use a blanket exclusion to deny coverage for those therapies.

Dkt. No. 9, *Exh. B*, p. 3. Despite Judge Trickey's injunctive and declaratory Order, ***Premera continued to apply the exclusion to all other Washington insureds except for A.G.*** It took more than a year of fighting Premera's procedural maneuvers up to the Washington Court of Appeals, back down to the trial court and then up to the Washington Supreme Court before plaintiffs obtained court-ordered classwide injunctive relief for Premera's non-ERISA insureds. *See* Hamburger Decl., ¶¶3-6, Dkt. No. 41, *Exh. A*, and Dkt. No. 52. Only after Premera lost its battle to avoid classwide injunctive relief in state court did it finally agree to negotiate a settlement involving all three cases, including this ERISA case. *See* Dkt. No. 53.

Premera fought hard to avoid prospective relief because that relief represents the most significant cost to the insurer (and the greatest benefit to Premera insureds). The reason is clear: many people simply cannot afford medical services. However, when insureds know they have coverage, they are able to access medically necessary services. This is known as the "insurance effect." *See* Fox Decl., ¶¶8-9; Dkt. No. 69,

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 4
[Case No. 2:13-cv-00097-RAJ]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

*Exh. A*, pp. 9, 19-23 (describing the "insurance effect" and the research documenting it). Dr. Fox concludes that the value of just one year of injunctive relief for NDT services alone is, conservatively, $3,055,794.  Fox Decl., ¶9.  Under the settlement, there is no limit on the duration of the prospective relief.  Yet, considering the prospective relief obtained for ***just one year*** and ***only for NDT*** (even though prospective relief was also obtained for ABA services), the value to the Class when, combined with the cash settlement fund, is more than $6.5 million.  *Id.*, ¶¶9-11.

Providing prospective relief for thousands of developmentally disabled Premera insureds has an additional, dramatic impact on the lives of class members that cannot be easily quantified.  As Stephen Glass, M.D., plaintiffs' expert neuropsychologist opined, the relief obtained can be ***life-altering***:

> NDT services are the only specialized health interventions provided to treat the needs of young developmentally disabled children.  ***These interventions, if provided on a timely and sufficiently intensive basis, often have the capacity to enhance the developmental skill attainment of such children with special needs, restore a child's development to more normal functioning or as near normal as possible,*** build adaptive and compensatory skills that serve to advantage, especially during early developmental years, and provide an individualized program of treatment, support and stimulation that will ultimately be reflected in a child's later cognitive ability.
>
> Children who need these therapies, but do not receive them (or do not receive them in a timely manner and at the required intensity), are likely to lose the developmental "window of opportunity" to have the impact of their developmental deficits reduced to the maximum degree, or to enjoy the prospects of their development being restored to normal functioning, or, at the very least, as near to normal functioning as possible.  The harm attendant in any delay in providing NDT services is real and substantial. Especially for the very young child, losing access to needed therapies in a

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 5
[Case No. 2:13-cv-00097-RAJ]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

timely manner can make reversible or treatable developmental conditions more severe, of greater long-term functional impact and, at times, devastating and unneeded consequences may be seen.

Glass Decl., ¶¶6-7 (emphasis added).  As a result of the named plaintiffs' efforts and that of their counsel, hundreds of thousands of Washington insureds now have access to coverage for medically necessary NDT and ABA services.  When these therapies are timely and appropriately provided within the "developmental window of opportunity," children's conditions can be dramatically improved.[2]  *Id.*

The $3,500,000 common fund for payment of back benefits is significant as well. Class counsel anticipates that the settlement amount will be sufficient to pay all claims at 100% even after the payment of attorney fees, costs, incentive awards and costs of administration.  Dkt. No. 63, Spoonemore Decl., ¶2.  If insufficient funds remain to pay all claimants at 100%, then all class members will receive a *pro rata* distribution of their approved claim amount.  Dkt. No. 62-1, *App. 1*, ¶ 8.4.7.  This distribution is in addition to the far-reaching prospective relief obtained.

Few class action cases have such dramatic effect on the lives of class members. When they do, courts appropriately order attorneys fees awards that reflect the extraordinary results.  For example, in *D.F. v. Wash. Health Care Auth.,* King County Superior Court, No. 10-2-29400-7, a similar common fund settlement was reached for $3.5 million.  Dkt. No. 69, *Exh. K,* p. 6.  The settlement included both prospective coverage of ABA therapy to treat ASD, and a common fund out of which payment of unpaid ABA claims would be made.  All *D.F.* claims were paid at 100% with residual

---

[2] Some children may ultimately "recover" from their developmental condition with timely, intensive interventions.  *See* http://www.nytimes.com/2013/01/17/health/some-with-autism-diagnosis-can-recover-study-finds.html?_r=0 (In one study, children who lost the ASD diagnosis were twice as likely to have received behavioral therapy such as ABA as those who continued to have the diagnosis).

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 6
[Case No. 2:13-cv-00097-RAJ]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

funds awarded by the *D.F.* Court under the *cy pres* doctrine.  *Id.*, ¶6.  Judge Susan Craighead granted class counsel request for attorneys' fees of 33% of the common fund, or $1,155,000.00.  Dkt. No. 69, *Exh. K*, p. 6.   The *D.F.* court also ordered $25,000 to each named plaintiff family as an incentive award.  *Id.*

Class counsel now seeks an award of fees based upon the common fund analysis of $1,225,000, representing 35% of the cash fund, but less than 18% of the total benefit resulting from the litigation, as well as litigation costs and incentive awards of $25,000 for each plaintiff family.

### III.   ANALYSIS

**A.      Legal Standard**

The percentage-of-recovery approach is used in calculating fees in common fund cases.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).   When state substantive law applies, the attorneys fees are to be awarded in accordance with state law.  *Id.*  The only significant difference between state and federal law on calculating attorneys fees is that Washington law applies the percentage method without the use of any "lodestar cross-check."  *Vizcaino,* 142 F. Supp. 2d at 1302 ("Under Washington law, the percentage method, without a lodestar cross-check, should be used in common fund cases.").

The primary consideration in the fee determination is the magnitude of the benefit conferred on class members.  "In a common fund case, the size of the recovery constitutes a suitable measure of the attorneys' performance."  *Bowles v. Washington Dept. of Ret. Sys.,* 121 Wn.2d 52, 72, 847 P.2d 440 (1993); *see also Vizcaino,* 142 F. Supp. 2d at 1302.  *Accord,* MANUAL FOR COMPLEX LITIGATION (4TH), § 14.121 ("[T]he factor given the greatest emphasis is the size of the fund created, because 'a common fund is itself the measure of success … [and] represents the benchmark from which a reasonable fee will be awarded.'") (hereinafter "MANUAL").  Once the size of the total benefit to the

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 7
[Case No. 2:13-cv-00097-RAJ]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

class is determined, the Court may award a percentage of the benefit as attorneys' fees. In Washington state, as well as the Ninth Circuit, the benchmark percentage is 25% of the total benefit.  *Bowles,* 121 Wn.2d at 72; *Vizcaino,* 290 F.3d at 1047.

The benchmark is not a cap or ceiling on fees.  "That percentage amount can then be adjusted upward or downward to account for any unusual circumstances involved in th[e] case."  *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir., 1989); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1310 (9th Cir. 1990) ("The benchmark percentage should be adjusted … when special circumstances indicate that the percentage recovery would be either too small or too large….").  Where exceptional circumstances exist, such as class action cases which are "risky and complicated," subjected to "vigorous opposition throughout the litigation," and where settlement is the result of class counsel's work, a higher percentage is appropriate.  *Morris v. Lifescan, Inc.*, 54 Fed. Appx. 663, 664 (9th Cir., 2003).   When supported by the complexity of the issues and the risks involved in the litigation, a court can – and should – depart from the benchmark.

The Ninth Circuit has upheld awards well above the 25% benchmark as reasonable when the district court has articulated the special circumstances justifying the percentage, including that the settlement resulted in substantial non-monetary relief.  *See Morris*, 54 Fed. Appx. at 664 (33%); *Principe v. Ukropina (In re Pacific Enters. Sec. Litig.),* 47 F.3d 373, 379 (9th Cir., 1995) (33%); *see also In re Ampicillin Antitrust Litigation,* 526 F. Supp. 494, 503 (D.D.C. 1981) (40.4%); *Van Gemert v. Boeing Co.,* 516 F. Supp. 412, 420 (S.D.N.Y. 1981) (36%).  In a study of attorney's fee awards in 2006-2007, nearly two-thirds of all awards were between 25-35%, with the most common fee awards in the Ninth Circuit being 25%, 30% and 33%.  *In re Toyota Motor Corp.*, 2013 U.S. Dist. LEXIS 94485, *219 (C.D. Cal., June 17, 2013).

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

Factors that may justify departure from the benchmark include: (1) the result obtained; (2) counsel's efforts, experience, and skill; (3) the complexity of the issues; (4) the risks of non-payment assumed by counsel; (5) the reaction of the class; (6) non-monetary benefits, such as clarification of certain points of law; and, when Washington substantive law does not apply, (6) comparison with the lodestar. *Vizcaino,* 290 F.3d 1048-50.  Even though the fees sought here are below the benchmark when taking into account the value of future benefits, this case meets every factor articulated in *Vizcaino* for an increase above the benchmark.

**B.     Class Counsel Achieved Extraordinary Results**

**1.     The Prospective Relief Obtained is Worth More than $3 Million per Year.**

The total size of the benefit is critical in common fund fee analysis.  As Dr. Fox explained, the majority of the value in the Settlement Agreement is in the prospective relief.  *See* Fox Decl., ¶9.   Premera fought bitterly to avoid classwide injunctive relief, and once it lost that battle in state court, it finally agreed to resolve this litigation.  It is also why prospective relief was, and remains, critical for class members.

Premera vigorously opposed prospective relief because that coverage is expensive – more expensive than paying for past out-of-pocket damages.   This distinction is due to the "insurance effect."  As Dr. Fox explains, if insureds do not have coverage for a certain medically necessary treatment, the lack of coverage essentially raises the price of the service for insureds.  For many insureds, the loss of coverage means that they will go without the service or they will use less of the service, even though the service is medically necessary.  Conversely, when coverage is put in place, many more insureds will seek the services they need because the price of the service has been effectively lowered.  *See* Dkt. No. 70, *Exh. A,* pp. 19-23; Fox Decl., ¶¶8-9.

Sirianni Youtz
Spoonemore Hamburger
999 Third Avenue, Suite 3650
Seattle, Washington 98104
Tel. (206) 223-0303   Fax (206) 223-0246

Based upon the insurance effect, Dr. Fox calculated that the value of coverage for just medically necessary NDT services to Premera insureds to be at least $3,055,794.00 for just one year's worth of claims. *Id.*, ¶9. Thus, the total benefit for Premera insureds is far more than the $3,500,000 fund for back damages. It includes at least an additional $3 million for a single year's worth of prospective NDT claims – and much, much more as the prospective relief extends indefinitely. *Id.*, ¶¶9-10.

### 2. Prospective Relief Also Provides Substantial Non-Monetary Benefit to Class Members.

Dr. Glass describes the life-changing effect of prospective coverage of NDT services. *See generally* Glass Decl. He notes that access to NDT services at the right time in a child's life can mean the difference between little or no disability and lifelong impairment. *See* Glass Decl., ¶¶6-8. For many class members, this benefit is far more significant than the savings that prospective relief represents. Where, as here, class counsel's advocacy resulted in meaningful benefits in addition to the cash settlement fund, an award above the benchmark is warranted. *Vizcaino*, 290 F.3d at 1049.

### 3. The Actual Common Fund Is Likely To Pay Claims At or Near 100%.

Even considering the size of the actual common fund alone, the settlement is an extraordinary result. The benchmark award of 25% contemplates compromise settlements which often result in claims awards for small fractions of a class member's actual loss. When class counsel is able to recover more than a small fraction of loss for individual class members, courts find that the recovery is "unusual" such that an award beyond 30% is warranted. *See In Re: Heritage Bond Lit.*, 2005 U.S. Dist. LEXIS 13555, *60 (C.D. Cal., June 10, 2005) (awarding 33⅓% because of "exceptional result" in obtaining settlement for just 23% of class members' losses, and citing cases awarding 33⅓% or more for recoveries ranging from 10% to 17% of class members' losses). Here,

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 10
[Case No. 2:13-cv-00097-RAJ]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON 98104
TEL. (206) 223-0303   FAX (206) 223-0246

class counsel anticipates that a full or near full recovery can be obtained for participating class members.

**4.      Residual Funds Will Be Distributed to Organizations To Assist Persons with Developmental Disabilities, Not Premera.**

Class members further benefit because  any funds remaining after paying claims, fees and costs will be distributed to the Legal Foundation of Washington (pursuant to Washington Civil Rule 23 (f)(2)) and organizations dedicated to assisting families with a family member with developmental conditions to access health care and health coverage.  Dkt. No. 62, *App. 1,* ¶ 8.4.6.  This, too, is unusual.  In many class action settlements (and judgments), excess funds revert back to the defendant after the claims process.  *See, e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472, 477, 100 S. Ct. 745 (1980).

**5.      The Litigation Spearheaded by Named Plaintiffs and their Parents Benefited All Washington Insureds.**

In many private class actions, class counsel will "piggyback" a case on the enforcement efforts of the government or on some other action.  *See e.g., Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C. Cir. 1993).  This case was just the opposite.

When *A.G. v. Premera* was first filed, the Office of the Insurance Commissioner (OIC) routinely allowed health carriers to include exclusions like Premera's "developmental disability" exclusion.  Hamburger Decl., ¶7.  The OIC failed to issue any regulations regarding the implementation of the Parity Act, even though it had been enacted years earlier.  *Id.*  Only after Judge Trickey confirmed that blanket exclusions of services to treat developmental disabilities violated the Parity Act and Washington public policy did the OIC announce that it would work on rulemaking.  *Id.* And, although that announcement was made in November 2012, the OIC waited until after this settlement was reached with Premera in May 2014 before finally distributing

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 11
[Case No. 2:13-cv-00097-RAJ]

a "discussion draft" for rulemaking.  *Id.*   In sum, the efforts of named plaintiffs and class counsel are and have been the primary enforcement mechanism in the State of Washington for violations of the state Mental Health Parity Act.  *See* Hamburger Decl., *Exh. A* ("Kreidler and the Legislature left enforcement to class-action lawyers, in particular attorneys Rick Spoonemore and Ele Hamburger.").

C.      **Effort, Experience and Skill of Class Counsel.**

Premera litigated these three cases to the hilt.  Shortly after the *A.G. v. Premera* case was filed, Premera moved to dismiss.  Plaintiff did not wait for discovery.  In response, Plaintiff moved for injunctive relief.  Hamburger Decl., ¶3.  After Judge Trickey issued an injunction (applicable only to A.G.) and denied Premera's motion, Premera moved for discretionary review, which was accepted by the Court of Appeals.  *Id.* ¶ 4.  Not content to sit on their hands for the year (or more) that discretionary review might take, class counsel moved before the Court of Appeals and then Judge Trickey to be able to have the injunction extended to all Premera non-ERISA insureds.  *Id.,* ¶¶ 4-6.  Judge Trickey agreed that classwide injunctive relief was appropriate and ultimately, in September 2013, the Washington Supreme Court permitted the injunctive order issued by Judge Trickey to be entered.  *Id.; see* Dkt. No. 52.  As noted above, it was the entry of that Order that brought Premera to the table to mediate all three cases.  *See* Dkt. No. 53. These cases involved significant, aggressive and time consuming effort from class counsel.

This is a relevant consideration in setting the appropriate fee percentage:

> Any appraisal of the risks inherent in instituting suit on a contingent basis also requires some evaluation of the character of the defense.  This should focus on two aspects.  First, there is the degree to which protraction in the case is attributable to the tactical maneuvers of the defendants.  Second, and not entirely separable from the first, the court should evaluate the professional quality of the defense.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

> Thus, some courts have indicated that the quality of opposing counsel bears on the risk factor.

7B FED. PRAC. & PROC. CIV., *Attorney Fees—Standards for Assessing* §1803.1 (3d ed.). Premera's aggressive procedural maneuvers to avoid classwide injunctive relief, and Class counsel's determined (and successful) efforts to undo them merit an above-the-benchmark award.

Class counsel had the right combination of class action and substantive ERISA/insurance law experience. They also retained top Washington experts in autism and neurodevelopmental conditions, including Stephen T. Glass, M.D., one of the region's leading pediatric neurologists; Charles Cowan, M.D., the medical director of Seattle Children's Autism Center; and Ilene Schwartz, Ph.D., the Director of the University of Washington's Haring Center for Applied Research and Training in Education, and a local expert on the provision of ABA therapy. Hamburger Decl., ¶9. Class counsel's ability to navigate the complex legal, regulatory and substantive mental health framework for all three cases was critical to their success.

**D.      Extraordinary Risk Assumed by Class Counsel.**

These three cases, all of first impression, were fraught with risk from the beginning. As noted above, the OIC had been asleep at the regulatory wheel, allowing insurers to include within their health plans all sorts of blanket exclusions which eliminated coverage of medically necessary mental health services. Hamburger Decl., ¶8. Premera raised the OIC's inaction as justification for its exclusionary practices at every turn. *See e.g.,* Dkt. No. 8, pp. 11-12; Dkt. No. 37, p.17; Dkt. No. 45, p. 4; Dkt. No. 49, pp. 3-4. A loss at any point would have killed all three lawsuits. This fact also justifies an upward adjustment from the usual range:

> [T]he Court recognizes that the case was extremely risky for class counsel to pursue because of negative facts, no controlling law and the vigorous defense of the case. Courts

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 13
[Case No. 2:13-cv-00097-RAJ]

have recognized that a high risk factor is one reason for increasing class counsel's attorney fee award above the "benchmark" 25% fee.

*Vizcaino*, 142 F. Supp. 2d at 1303.

In addition to being risky from a legal and factual perspective, this case posed financial risks to class counsel.  Not only were class counsel's fees contingent upon success, but costs were as well.  *See* RPC 1.8(e)(2) ("[I]n matters maintained as class actions only, repayment of expenses of litigation may be contingent on the outcome of the matter.").  A loss would have cost class counsel over 1,000 hours in lost income-generating time (representing more than $600,000 in time value) and approximately $66,681.72 in earned firm income that was expended on costs.  Hamburger Decl., *Exhs. B-D*.  This is an extraordinary commitment for a small law firm.  *See* A. Conte, ATTORNEY FEE AWARDS, §2.22 (3d ed. 2012) ("special factors" include "burdens caused by the expenditure of time and money by a small firm"); *Municipal Authority of Town of Bloomsburg v. Com. of Pa.*, 527 F. Supp. 982, 994 (M.D. Penn. 1981) ("expending 795.3 hours … without any guarantee of remuneration over a period of almost two years" is "a substantial financial risk to a small firm").

Class counsel also had to turn away hourly work and other attractive contingent fee matters because of the time and financial commitment demanded by this litigation. Hamburger Decl., ¶10.  These risks, on a novel legal claim, were far from typical even for a contingent fee case.  Where, as here, the litigation has resulted in broad public policy change benefitting thousands of Washington residents, the risks involved should be incentivized.  *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1364 (S.D. Fla. 2011) ("[G]iven the positive societal benefits to be gained from lawyers' willingness to undertake difficult and risky, yet important, work like this, such decisions must be properly incentivized.").

MOTION FOR ATTORNEYS FEES, EXPENSES AND INCENTIVE AWARDS – 14
[Case No. 2:13-cv-00097-RAJ]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

**E.      Reaction of the Class**

It is too early in the claims process for the Court or Class counsel to evaluate the reaction of the Class.  To date, however, class counsel has only received a single opt-out, and class members with NDT claims who have called report to Class counsel that they are pleased with the results.  Hamburger Decl., ¶11.  If class members' approved claims are paid in full, then a fee award of 35% will not prejudice any class member.

**F.      Complexity and Novelty of the Issue**

"Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award."  *In Re: Heritage Bond Lit.*, 2005 WL 1594403, *20.

> Cases of first impression generally require more time and effort on the attorney's part … [counsel] should not be penalized for undertaking a case which may 'make new law,' [but] appropriately compensated for accepting the challenge."

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 718 (5th Cir. 1974).  This was not a cookie-cutter securities or stock-drop case.  Class counsel brought the first cases interpreting and enforcing the state Mental Health Parity Act in our state and among the very first in the country.  Based upon the path blazed by the Premera litigation, attorneys representing children with ASD in other states are achieving the same or similar outcomes.  *See A.F. v. Providence Health Plan,* 2014 U.S. Dist. LEXIS 109507 *45 (D. Ore., Aug. 8, 2014) (following Judge Trickey's decision in *A.G. v. Premera* by holding that Providence Health Plan's "developmental disabilities" exclusion violates both the Oregon and Federal Mental Health Parity Acts).

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 15
[Case No. 2:13-cv-00097-RAJ]

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

### G.     Lodestar Cross Check

As noted above, the lodestar cross-check does not apply under Washington substantive law.  *Vizcaino,* 142 F. Supp. 2d at 1302.  Nonetheless, even if the cross-check is applied, the requested $1,225,000 represents a multiplier of only 2.0.

When comparing to the lodestar, multipliers range from 0.6 to 19.6, with most in the 1.0 to 4.0 range.  *Vizcaino,* 290 F.3d at 1051, n. 6.  Multipliers of 4 or higher are often approved.  *Vizcaino,* 142 F. Supp. 2d at 1305 (multiplier of 3-4 is "wholly justified" by duration of case and combative nature of defendant).  *See also* Newberg on Class Actions, § 14.6 (multipliers of five or more justified in significant recoveries, collecting cases); *Craft v. County of San Bernardino,* 624 F. Supp. 2d 1113, 1122 (C.D. Cal. 2008) (approving 5.2 multiplier, "there is ample authority for such awards resulting in multiplier in this range or higher" and noting that a court should not punish efficient counsel:  "[o]ther counsel … would likely have had to expend considerably more time to accomplish the same result.") (collecting cases).   Class counsel's request for $1,225,000 is well within the appropriate range for reasonable multipliers, especially given the risks and benefits involved in the cases.

### H.     Class Counsel's Out-Of-Pocket Costs and Expenses Should Be Reimbursed.

Litigation costs are recoverable in a class action settlement.  *Staton v. Boeing Co.,* 327 F.3d 938, 975 (9th Cir. 2003); *In re Media Vision Tech. Sec. Litig.,* 913 F. Supp. 1362, 1366 (N.D. Cal. 1996) ("Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit by the settlement").  The expenses are awarded "in addition to the fee percentage."   Conte, Attorney Fee Awards §§2.08, 2:19 (3d ed.); *In re Businessland Sec. Lit.,* 1991 U.S. Dist. LEXIS 8962, *6 (June 18, 1991) (same; collecting cases).  Reimbursement of the costs is subject to the court's determination of relevance and reasonableness.  *Id.*

Sirianni Youtz
Spoonemore Hamburger
999 Third Avenue, Suite 3650
Seattle, Washington 98104
Tel. (206) 223-0303   Fax (206) 223-0246

As of September 12, 2014, Class counsel had incurred $66,681.72 in costs and out-of-pocket expenses for all three cases.  Hamburger Decl., *Exhs. B-D.*  The bulk of the expenses relates to payments to the experts hired by the plaintiff Class, the costs of mediation, and discovery-related expenses.  *Id.*  Class counsel has been paying for all costs out-of-pocket with no guarantee of ever being repaid if the action was lost.  Class counsel had every incentive to be cautious in incurring costs.  All of those costs were necessary to achieve the settlement of this matter, and were reasonable.

**I.    Incentive Awards of $25,000 per plaintiff family are appropriate.**

The Court has the discretion to order incentive awards, and courts routinely do so for class representatives who act as a private attorney general and undertake financial and reputational risks for the class.  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009); *see, e.g., In re GNC Shareholder Litig.*, 668 F. Supp. 450, 451 (W.D. Pa. 1987); *Linney*, 1997 WL 450064 at *7; *see generally* Newberg, § 11.38.  A study by the Federal Judicial Center of four federal district courts found that a substantial number of class action settlements included designated awards to class representatives. T. Willging, L. Hooper, and R. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* (Federal Judicial Center 1996).  In 1994, the median incentive awards to class representatives in northern California was $17,000 and ranged up to $28,600 in cases with an average monetary settlement of $10 million.  *Id.*, p. 26.  A more recent study revealed that in insurance class action litigation, the average incentive award was $28,708.90.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Symposium: Emerging Issues in Class Action Law: Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1308, 1333 (Aug. 2006) (Across all categories of cases, the average award was $15,992 per class representative).  The proposed $25,000 award for each plaintiff family is well within the range of incentive awards granted in similar class action litigation.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

Courts have used the following criteria when determining the amount of an incentive award:

> (1) the risk to the class representative in commencing a class action, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit, or lack thereof, enjoyed by the class representative as a result of the litigation.

*Pelletz v. Weyerhaeuser Co.,* 592 F. Supp. 2d 1322, 1329 (W.D. Wash. 2009).   The declarations of the named plaintiffs' parents demonstrate that each have undertaken significant risk, effort, and time away from work and their families to act as a private attorney general in this litigation.

Each parent spent many hours attempting to obtain coverage for their child, pre-litigation.  *See e.g.,* P.H. Decl., ¶4.  P.N. and M.M. undertook hours of effort to appeal Premera's denials administratively.  M.M. Decl., ¶4; P.N. Decl., ¶¶5-8.  P.N. even filed a complaint with the Office of the Insurance Commissioner on behalf of her two daughters.  *Id.*  The parents completed these appeals and complaints on their own without legal representation.  *Id.*, ¶8; M.M. Decl., ¶4.

Premera deposed at least one parent of every named plaintiff, and sometimes both parents in depositions that lasted many hours.  *See* J.G. Decl., ¶7; P.N. Decl., ¶9; M.M. Decl. ¶6; P.H., ¶5.  These depositions were extremely difficult and stressful for the plaintiff parents as they were forced to recount their children's diagnostic odyssey in a hostile environment.  *See id.; see also* Dkt. No. 69, ¶4(c).  While Premera's counsel was professional while fulfilling their obligations as defense counsel, the plaintiff parents experienced the depositions as if Premera blamed them for not having their children diagnosed earlier, or for being unable to afford the treatment that their child needed after Premera's denials.  *Id.*  As M.M. describes the experience, "I was asked

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246

painful questions about J.'s medical and developmental history and even my divorce.  I felt that making me relive all of these painful experiences just to get Premera to cover the services that they should have always covered was wrong.   Nonetheless, I answered Premera's questions and would do so again in order to get J. and other insureds the services they need."  M.M. Decl. ¶6.

Premera served extensive discovery on each family, sometimes asking for medical, educational and psychological/behavioral records going back more than ten years.  P.H. Decl., ¶6; M.M. Decl., ¶5; P.N. Decl., ¶10; J.G. Decl., ¶6.  For one plaintiff, Premera sought 23 years of records.  M.M. Decl., ¶5.  One set of parents tracked their exact hours, recording more than 18 hours to gather and organize the extensive documents requested by Premera in discovery.  *See e.g.,* J.G. Decl., ¶6; *see also* P.H. Decl., ¶10.  The plaintiff families also had to respond to and reassure their children's medical, mental health and educational providers who received subpoenas for their records.  P.H. Decl.,¶6; M.M. Decl., ¶7; P.N. Decl., ¶10; J.G. Decl., ¶8.

Named plaintiffs had at least one and sometimes both parents participate in the multiple mediation sessions.  P.H. Decl., ¶7; M.M. Decl., ¶8; P.N. Decl., ¶11; J.G. Decl., ¶9; *see* Dkt. No. 63, ¶2 (a total of five mediation sessions were held with three different mediators).    The parents had to make extensive arrangements for time off from work, specialized child care for their children with ASD, and most traveled long distances to attend.  *Id*.  Many lost work income for the time taken to participate in mediation.  *Id*.  For one mediation session, Plaintiff J.P.'s mother had to shovel her way out of several feet of snow at her mountain home outside of Bellingham and drive two hours to attend the mediation, and when it was over, drove home again in a snow storm.  M.M. Decl., ¶8.

In sum, each of the parents took their role as private attorney general and fiduciary for thousands of developmentally disabled Premera insureds very seriously.

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 19
[Case No. 2:13-cv-00097-RAJ]

They committed much of their limited free time and lost work hours in order to see this case to its very successful completion.  They had many uncompensated expenses arising from this case, including the cost of specialized child care, transportation, and lost pay.  But each of them would do it all again.  As P.N. said about her two daughters with ASD, "I worried about how they would learn the basis for their lives – things that other people take for granted, things that are necessary for them to have a life worth living.  I knew we could not wait to get them help.  They need help now and so did many other children.  That is why we became a part of this lawsuit, despite the stress, difficulty and expense associated with it."  P.N. Decl., ¶17.  In light of the plaintiff parents' unfailing commitment to ensuring that other children who have developmental disabilities obtain access to NDT and ABA therapies that they need, incentive awards of $25,000 per plaintiff family should be authorized.

Only plaintiff R.H. is before the Court in this case.  Class counsel requests that this Court award R.H., by and through his parents P.H. and N.B.-H., an incentive award of $25,000.

### IV.  CONCLUSION

For the foregoing reasons, the Class respectfully requests that this Court grant its Motion and award attorneys fees of $1,225,000, and an incentive award of $25,000 to R.H., by and through his parents P.H. and N.B.-H., and reimbursement of all costs and out-of-pocket expenses, totaling at present $66,681.72.

DATED:  September 11, 2014.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER

By   /s/ Eleanor Hamburger
Richard E. Spoonemore (WSBA #21833)
Eleanor Hamburger (WSBA #26478)
*Attorneys for Class*

MOTION FOR ATTORNEYS FEES, EXPENSES
AND INCENTIVE AWARDS – 20
[Case No. 2:13-cv-00097-RAJ]

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

- **Barbara J Duffy**
  duffyb@lanepowell.com, Docketing-SEA@LanePowell.com, wileyj@lanepowell.com

- **Eleanor Hamburger**
  ehamburger@sylaw.com, matt@sylaw.com, theresa@sylaw.com

- **Ryan P McBride**
  mcbrider@lanepowell.com, savariak@lanepowell.com, docketing-sea@lanepowell.com

- **Gwendolyn C. Payton**
  paytong@lanepowell.com, Docketing-SEA@LanePowell.com, rountreei@lanepowell.com

- **Richard E Spoonemore**
  rspoonemore@sylaw.com, matt@sylaw.com, rspoonemore@hotmail.com, theresa@sylaw.com

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

- (No manual recipients)

DATED:  September 12, 2014, at Seattle, Washington.

_/s/ Eleanor Hamburger_
Eleanor Hamburger (WSBA #26478)

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER
999 THIRD AVENUE, SUITE 3650
SEATTLE, WASHINGTON  98104
TEL. (206) 223-0303   FAX (206) 223-0246